UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**RECEIVED**
December 14, 2020
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ Jay Vicha _____
DEPUTY

**FILED**
December 14, 2020
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ Jay Vicha _____
DEPUTY

CANADIAN STANDARDS ASSOCIATION
An Agency of the Government of Canada

v.

1:20-CV-01160-LY

PS KNIGHT AMERICAS INC
A Texas Corporation

MOTION TO DISMISS

Now comes PS Knight Americas Inc, Defendant pro se, to request that the Court dismiss the claim.

Date:       December 14, 2020

Signature:

Address:    2701 #100 Box 449
            Little Ecw pkwy 75068

Phone:      403 650 9455
            469 612 2278 (local TX)

## CERTIFICATE OF SERVICE

I, Gordon Knight, representing PS Knight Americas Inc, Defendant pro se, do hereby certify that on the 14th Day of December, 2020, a true and correct copy of the foregoing pleading was forwarded to Nicole Williams of Thompson Coburn LLP, the attorney for the Canadian Standards Association, by FedEx Courier on tracking number 781405158828 at the following address:

Thompson Coburn LLC
2100 Ross Ave Ste 600
Dallas TX 75201
Tel.972.629.7100

Dated:  14 December 2020

Gordon Knight, for PS Knight Americas Inc.

**PROCEDURAL NOTE**

We are in year nine of the Canadian Standards Association's (CSA's) various and duplicated litigations and can no longer afford legal counsel.

We are unfamiliar with Court filing requirements and are doing our best in good faith to discern them and comply with them.

It was unclear whether we were required to file a Response to the Summons in addition to this Motion to Dismiss, or if the Motion was sufficient and a Response only required in the event that the Motion was Ruled against by this Court.

To verify the requirements upon us, a call was placed to the Austin Divisional Office (512-916-5896) at 10:35AM on Dec 10, 2020, speaking with "Laura," asking the following question (exactly as delivered);

> *"When filing for a Motion to Dismiss, do I also need to file a separate Answer to the claim?  Or is the requirement that I furnish an Answer stayed until the Motion to Dismiss has been considered and Ruled upon?"*

Laura advised that she could not answer the question of legal requirements because, in her judgement, the question was one of legal advice rather than legal requirement.  Instead, she advised that we do our own research in the Federal Rule of Civil Procedure, the local Court Rules, and other documents on their website.  We did so.

We note Rule 12(b)(6) of the Federal Rules of Civil Procedure which appears to indicate that Motions to Dismiss "may be filed before or after defendant has filed an answer."  Taken in the

context of the balance of text in this section, we understand this to mean that our Motion to Dismiss, filed before our answer, is acceptable to the Court and, should our Motion be Ruled against, we would be able to file our answer within a reasonable time of that Ruling, perhaps specified within that Ruling.

We are also unclear on the amount of evidence that should accompany this filing.  We note Rule 8(a) indicates that abbreviated evidence is expected whereas a "heightened fact pleading of specifics" is unacceptable.  Clearly then, there is a balance required.

In this, we have furnished a sampling of evidences in this filing to support the main tenets of argument without including the mass of documentation one would normally expect for a fulsome demonstration of the facts.

We rely on the good faith of the Court in appreciating that for lack of experience we may have erred on one side or the other in achieving the prescribed balance.


**REQUEST OF THE COURT**

This Motion, in respect of Case No. 1:20-cv-1160, is filed by the Defendant PS Knight Americas Inc on its own.  The other two Defendants, PS Knight Co Ltd and Gordon Knight, have not been served.

We request that the Court dismiss the claim on the basis that; 1) the Court lacks jurisdiction over the subject matter; 2) the venue is improper, and; 3) the Plaintiff has failed to state a claim which the law will recognize as enforceable.


**THE COURT LACKS JURISDICTION**

1.    The Canadian Standards Association (CSA) has referred to the Defendant's publication, Knight's Code, an authorized reproduction of Canadian electrical law, as a publication infringing on their Canadian copyright.

2.    The proper jurisdiction for matters of Canadian copyright is Canada.

3.    The CSA claims jurisdiction of this Court on the basis of the Berne Convention for the Protection of Literary and Artistic Works (Berne).

4.    The Berne Convention is applicable to works copyrighted in Canada (in this instance) that are sold from the United States into the US market.

5.    Canadian electrical law is not applicable in the United States.  Rather, US electrical law is the National Electrical Code, a very different text.  In this, demand for copies of Canadian electrical law in the US is negligible and, in the experience of PS Knight, non-existent.

6.    PS Knight Americas Inc sells its Canadian publication exclusively to Canadian customers as Canadians are the only customers with need to access Canadian electrical law.

7.    It is true that PS Knight Americas Inc has *capability* to sell copies Knight's Code into the United States, but only in the same sense that it could sell copies into Norway or Japan or the Malagasy Republic.

8.    A potential crime is not prosecutable.

9.    Without actual, substantial, and verifiable sales into the US there is no breach of Berne and therefore no basis to the Plaintiff's case.

**THE VENUE IS NOT PROPER**

10.    The Plaintiff is an Agency of the Federal Government of Canada, a critical fact dealt with in detail below.

11.    The Government of Canada has within its natural purview all of the authorities needed to rectify genuine instances of copyright violation within its own borders.

12.    The first recourse remedy, if the Canadian Government genuinely believes in the validity of its claim, is to Rule the offending books contraband in Canada.

13.    Of course, as Knight's Code is a reproduction of electrical law, such action would make the law itself illegal.  Possessions of copies of law would be punishable.  Such an absurdity would undermine the enforceability of that law and the credibility of the Court system which so Ruled it.

14.    Further, as Knight's Code is a reproduction of law specifically authorized under Alberta Queen's Printer Copyright, and is further authorized through PS Knight's possession of a valid copyright assignment for text of that law, duly and lawfully registered in the United States, and is additionally authorized by a valid and current license from CSA itself to reproduce the text of law,  the first recourse remedy would necessarily expose the absurdity of the Government position.  Hence the Canadian Government preference to outsource the enforcement of their more contradictory and politically challenging positions to this honourable Court.

15.    Notwithstanding the Canadian Government's apparent motives for filing with this Court, it does not appear proper for a foreign government to expect a US Court to enforce Canadian law on a US entity in a US jurisdiction.

16.   Notwithstanding the awkwardness of the Canadian Government's self-inflicted difficulty, the proper jurisdiction for the Canadian Government is the Country of Canada, its own Court system and its regulatory enforcement framework.

**PLAINTIFF FAILS TO STATE A CLAIM WHICH THE LAW WILL RECOGNIZE AS ENFORCEABLE**

17.   The PS Knight Americas Inc copyright was accurately and validly registered in the US.

18.   The various objections to this US copyright, as raised by CSA, are implausible and easily refuted, as outlined below.

19.   The Berne Convention is inapplicable for reasons noted above and cannot plausibly be stretched into applicability in this case without substantively impairing the original purpose, and future applicability, of Berne.

20.   The basis for the CSA claim of copyright on Canadian electrical law is a Canadian Federal Court Ruling, known as "Manson's Law," as outlined in detail below.

21.   Manson's Law states that legislation may be privately owned by whomever drafted it, provided that person is not in government employ and further provided that person holds a valid copyright assignment covering the relevant text.

22.   Manson's Law has been upheld in Canada by the Federal Court of Appeal and, by declining to hear further appeal, by the Supreme Court of Canada.

23.   Manson's Law however, is applicable only within Canada, not the United States.  The CSA's claim of copyright ownership is entirely based within Manson's Law.

24. The Supreme Court of the United States has already, and recently, Ruled on the question of private ownership of law, declaring that laws are intrinsically public and cannot be owned.

25. The CSA argument then, is that this honourable Court should ignore the Ruling of the US Supreme Court on private law ownership and instead enforce the foreign Manson's Law on a US citizen.

26. More damning still, as CSA is an Agency of the Federal Government of Canada and its staff are civil servants, and as the rights of private ownership of legislation afforded through Manson's Law cannot apply to civil servants, the CSA does not itself have a valid claim to copyright of Canadian electrical law.

27. One may further question if CSA's claim is enforceable as it assumes this US Court functions as a de facto enforcement arm of the Canadian Government.

**LEGAL STATUS OF THE CANADIAN STANDARDS ASSOCIATION**

28. According to Pg.2, Para.2 of the Plaintiff's filing, the Canadian Standards Association (CSA) is a "private, not-for-profit" entity and, in the same paragraph, "a private corporation" and at Pg.5 Para.11, a "not-for-profit corporation."

29. The Canadian Civil Service however, has testified in Ontario Court that CSA "is in fact a public entity.  It is an extension of the arm of the Government of Canada.  All of its employees work for the Government of Canada.  Its processes are pursuant to the Government of Canada."

30.   Indeed, even unionized staff at CSA are members of a public sector union, the Canadian Union of Public Employees (CUPE), Local 967.

31.   The Canadian Civil Service has likewise testified in Ontario Court that "these [CSA employees] are public officers, which they are."  Further, the CSA "is a public authority."

32.   Justice Quamina of Ontario Provincial Court Ruled that CSA is part of Government, pointing out that CSA salaries are "set by the Government."  The Court noted that its Ruling was directed "to the Government," not to a not-for-profit entity.

33.   As for history, the CSA was founded in 1917, in London during the British Empire.  We know this from original, though peripheral sources -those in British Government Archives for instance, but the Canadian records are restricted from access by the Canadian Civil Service.  We know this restriction directly, as a number of Members of Parliament (MPs), acting on our behalf, requested access to original patriation documents for CSA, covering the transfer of the Agency from the British Empire to the Dominion of Canada, and were stalled for months, then denied entirely.

34.   In contrast, the CSA has declared repeatedly in Court that it was founded two years later, in 1919, yet they have declined to explain how they were recorded as present at a series of munitions conferences during the First World War, more than two years before they claim to have existed (as; early in 1917 vs late in 1919).  Tellingly, according to archive, the CSA delegation was accredited as Government representatives at each of these conferences.

35.   The Canadian Civil Service has testified of CSA's creation in provincial Court that "…pursuant to its creation by either the previous entity, the British Government and its subsequent entity of the Government of Canada."

36.  The CSA is also listed as a Canadian Government Agency in municipal phone directories in every year from its patriation to Canada in 1919 until 1970, when Parliamentarians began asking pointed questions as to CSA's legal status.  [Samples at Exhibit 1]

37.  Municipal phone directories not only record CSA as a Canadian Government Agency, but they also show CSA as a subsidiary tenant of Industry Canada, occupying a series of Government buildings.

38.  The Canadian Government's own internal phone directories show CSA as a Federal Agency, with offices in Government buildings, consistently, year after year, for decades. [Samples at Exhibit 2]

39.  Further, CSA has been afforded powers of legislation and it runs legislative committees, amending by their own admission >2,000 laws in Canada.

40.  Canadian electrical laws, the "Canadian Electrical Code," is just one such legislation emanating from CSA's legislative activities.

41.  Indeed, the CSA has been granted "Accepted-as-Amended" authority to change domestic law without Parliamentary or other legislative review [example at Exhibit 5, at "Code"].  The Province of Alberta is one such jurisdiction in which CSA has this autonomous legislative authority. [Exhibit 3, Pt.3]  Such authority is intrinsically legislative, not private.

42.  Canadian electrical laws in Alberta are specifically designated as Accepted-as-Amended legislation. [Exhibit 3; Pt.3]

43.  The CSA has also been granted "limited protections from civil litigation," that is, legislative immunities for their Government functions.

44.    The CEO of CSA in 2014, Ash Sahi, admitted during negotiations that CSA was, and
       remains, part of the Government of Canada. [Exhibit 4 – Notes to my legal counsel after
       meeting]

45.    The CSA's private registration was permitted at patriation in 1919 specifically to
       facilitate the lease of office space in Montreal when that city lacked by-laws to
       accommodate the Federal Agency.  The same arrangements have also been made for
       the Federal Police (the RCMP) in leasing space in shopping malls and schools.

46.    Critically however, Courts have consistently held that in adjudicating competing
       registrations, as public and private, the private registration is subsidiary to the public
       registration, as the latter is uniquely empowered.

47.    Likewise, Canadian Courts have also consistently Ruled that even a wholly private entity
       is considered a government entity if it has been afforded with the authorities,
       responsibilities, or affectations of intrinsically government activity.

48.    To the Court, the CSA posits baseless, sweeping proclamations to convince that its claim
       to be a private entity is correct, apparently in the opinion that the emphasis of its
       assertion offsets the paucity of evidence to support it.

49.    Regardless, we are not bound to repetition of Canadian Civil Service deceit.  For the
       balance of this filing, we will refer accurately to the CSA and the Canadian Civil Service
       as identical, using the terms interchangeably.


**Legal Status of the Canadian Electrical Code**

50.   According to Pg.2, Para.2 of the Canadian Civil Service' filing, the Canadian Electrical Code is a "standard," not a law.

51.   What then, is the body of electrical law in Canada?  If not the Code, then what is the law?

52.   There is no other text of legislation identified as electrical law in Canada.

53.   Every jurisdiction in Canada has passed the Canadian Electrical Code into law.  There are no jurisdictional exceptions. [Examples at Exhibit 3, 5, 6]

54.   Positing that the Canadian Electrical Code is not a law but a mere "standard," a sort of suggestion one could take or leave, is as dangerous to public safety as patently absurd. Yet it has been the Canadian Civil Service position in Court since their first filing against PS Knight Co Ltd and Gordon Knight in 2012, and it now remains their position in their US filing against PS Knight Americas Inc in 2020.

55.   Critically, when not in Court the Canadian Civil Service admits that the Canadian Electrical Code is law.  In a full-page advertisement, the Civil Service described the Code straightly, explaining why electricians should buy a copy, saying in large letters; "Electrical Installations in Ontario Must Adhere to the Ontario Electrical Safety Code - *It's the Law*" [emphasis in original] [Exhibit 7].  Kindly note that the Ontario Electrical Safety Code is the Canadian Electrical Code, with Ontario's Provincial amendments added.

56.   Further, on their own FAQ page of their website, the Canadian Civil Service declares that "a standard or code becomes law only if [sic] becomes referenced in legislation by a federal, provincial or municipal government, or any authority having jurisdiction." [Exhibit 8]

57.   Yet while the Canadian Civil Service admits in their filing to this Court that the Code "has been incorporated by reference into several regulations and statutes in Canada," making it by even their own definition part of Canadian law, they advise this Court that the Code instead is a mere "voluntary safety standard." [See CSA P.2 Para.2]

58.   In other words, what they have called a "standard" in Court is what they call a "law" in the market.

59.   As a matter of law, and as admitted by CSA, the Canadian Electrical Code is law because it is incorporated by reference within legislation and forms part of the text of that legislation.  The Code is written into the law by the doctrine of incorporation when the incorporating legislation was published in the Gazette (the legislative record).  At the time of incorporation, the Canadian Electrical Code became an integral part of the incorporating instrument as if the text was actually reproduced in full therein.

60.   The Canadian Parliament has incorporated the Code into the Canada Labour Code, for example.  Parliament specifically authorised incorporation of the Code into the Labour Code and it is an offence to violate the adopted Code within that legislation.

61.   Federally, the Canadian Electrical Code is also incorporated into the Uranium Mines Regulations, National Parks Cottages Regulations, Oil and Gas Drilling Regulations, and a wide range of other legislation.

62.   The Canadian Electrical Code is also incorporated into Ontario's Electricity Act when it was most recently updated and is its enforcing legislation.  Violation of the Code constitutes an offence that provides for liability up to a $50,000 fine or one year of imprisonment.

63.   The Canadian Electrical Code as amended is law under Ontario's Legislation Act and criminal proceedings are brought for its contravention.  In British Columbia, the Code is valid and enforceable law, and has been for decades, even though it was not attached to, or published in, the Gazette with the regulations that incorporate it.

64.   Critically, under the Statutory Instruments Act in Canada, any text is defined as law if it has been passed by a legitimate legislative authority, and if the particulars of that text are binding within the subject jurisdiction, and if there are specific penalties applicable for noncompliance.  The Canadian Electrical Code is law under this Statute because all three criteria are met in every jurisdiction in Canada.

65.   In January 2018, the Federal Court of Canada Ruled that the Code, and the >2,000 other legislation produced by CSA, are covered under Federal Public Review laws (governing the development of draft legislation).

66.   The Court further Ruled that CSA is in material breach of Public Review laws, as the "Code has clearly not been available for public comment for [the required] 60 days." [Exhibit 9, P.5, Para 9]

67.   In December 2018, the Canadian Federal Court of Appeal Ruled that "any writing may be subject of copyright in Canada.  This would include laws and regulations." [Exhibit 10 Para.73]  And again; "That law and regulations may be the subject of copyright is indeed recognized." [Exhibit 10 Para.74]

68.   The subject of this Canadian Federal Court of Appeal Ruling was the Canadian Electrical Code.  Thus, the Court of Appeal is unambiguous that the Code is law in Canada.

69.   Therefore, the Canadian Electrical Code is law by legal precedent on Gazetting and incorporation by reference, by Federal Acts and enforcement, by Provincial Acts and

enforcement, by definition of the Statutory Instruments Act, and by Rulings of the Federal Court of Canada and the Canadian Federal Court of Appeal.

**PS KNIGHT HAS ACCURATELY CHARACTERIZED THE LAW**

70.   The actual promotion copy for the 2015 Knight's Code read as follows (and is unchanged and still available on the Knight's Code page of the Defendant's website); [Exhibit 11]

71.   "The Canadian Electrical Code is the body of electrical law in Canada." [Exhibit 11]  And;

72.   "As an authorized reprinting of electrical law, all illustrations, explanations and descriptions therein are presented entirely and exactly as enacted by Governments." [Exhibit 11]

73.   Contrary to Canadian Civil Service claims, we have never pitched electrical laws as the private property of the Civil Service.

74.   Note that our description of the Code makes the same claim as CSA's description in their own promotional materials, as;  "Electrical Installations in Ontario Must Adhere to the Ontario Electrical Safety Code - *It's the Law*" [emphasis in original].  [Exhibit 7]

75.   The crux of the matter is whether the Code was law or not, and whether laws could be privately owned, in 2015.

76.   The Canadian Civil Service has already admitted that the Code is law in their own promotions and on their own website, as noted above.

77.  The Ruling which made public laws into private property, Federal Court's T-646-15, known as "Manson's Law," was not passed until the following year, 2016.  [CSA filing, P.161 (though not marked as an Exhibit and is missing page numbers)]

78.  In other words, at the time that our promotional copy was drafted, the copy was accurate was echoed by the Civil Service' own promotional copy.

79.  Notwithstanding the issues over Manson's Law, one should note that the Governments of Canada are still asserting Queen's Printer Copyright over the text of electrical laws. [Exhibit 12]  Our current use of 2015 promotional copy is therefore still accurate in spite of the applicational particulars, in royalty and permissions, of Manson's Law.

80.  Further, our characterization of electrical law in our US registration is likewise accurate.

81.  We hold a valid copyright assignment, predating Manson's Law, covering ~5% of the text of that law. [Exhibit 13]  Obviously, this copyright assignment is the corporate basis for our copyright registration.

82.  We have thousands of pages of working papers, meeting minutes, attendance records, stages of drafts of legislative text from pencil notes through final inclusion in the Code; we have in archives written commentary between parties in the drafting process, Government correspondence on official letterhead verifying our contributions and sundry legislative activity; we even have about eleven hours of audio from legislative drafting sessions when Peter Knight was recording secretary (a rotating position).

83.  Our copyright assignment is very well supported.

84.   Ironically, CSA's assignments are not well supported.  All they have produced to support their claims are copyright assignments covering ~8% of the text of electrical law and, critically, no supporting documents whatsoever.

85.   Further, we have specific authorization from CSA to reproduce the text they are suing us for having reproduced. [Exhibit 14]

86.   In 1969, near the start of PS Knight activity, we received from CSA an open-ended license to reproduce unrestrictedly as much as we liked from the Code. [Exhibit 14]  We needed this license to cover the gap between the Canadian Civil Service issuance of the Codes and their subsequent passage into law.  Historically, this gap has been about a year in length.  Once the Code was passed into law it was covered under Alberta Queen's Printer Copyright and, under those terms, usable without restriction.

87.   Alberta Queen's Printer Copyright applies to all legislation passed in Alberta, such as electrical law, and affords anyone the absolute and unrestricted right to reproduce any of it for any purpose without charge and without seeking permission to do so (as outlined below).

88.   Other of CSA's complaints about our US copyright registration are likewise baseless.

89.   The claim that we falsified Peter Knight's contributions is nonsensical, as we accurately input his dates of birth and death and the registration document clearly shows this.  As should be obvious, his contributions predated his death.

90.   The idea that one's contributions to any text are somehow obliterated from existence upon their death is, shall we say, a unique perspective on mortality, not especially well supported anywhere.

**PS KNIGHT PUBLISHING RECORD**

91.  PS Knight first published the Electrical Code Simplified (ECS), a wiring guidebook, as a
     sole proprietor in 1967.

92.  The ECS books necessarily quoted extensively from electrical law in providing instruction
     in compliance with that law.

93.  In 1969, after a series of communication between the Canadian Civil Service and Peter
     Knight, the CSA signed an unrestricted license to PS Knight reproduce any percent of
     Canadian Electrical Code open-endedly. [Exhibit 14]

94.  It should be noted that there is often a gap of several months (in the Canadian Provinces
     of British Columba and Ontario) between the release of a new iteration of the electrical
     code and its passage into law.  Once passed into law, the code is covered under Queen's
     Printer Copyright (the default copyright for all legislation).  Thus, the Code prior to
     passage into law is Civil Service copyright, whereas upon passage into law is under
     Queen's Printer Copyright.  In the gap between release and passage into law, PS Knight
     required CSA's permission to reproduce the text of the Code.

95.  In 1974, a Commercial & Industrial version of ECS was released, and is still in publication.
     This version quotes from >70% of electrical law in every year of publication, 1974 to
     present.

96.  Peter Knight incorporated as PS Knight Co Ltd in 1985.

97.  Over an uninterrupted period of 37 years, from 1967 – 2004, the Canadian Civil Service
     supported the work of PS Knight and actively participated in the publication of every

edition of Electrical Code Simplified throughout these years, through the provision of "Advance Memoranda" (listing of coming changes to the Code), documents furnished in compliance with Federal Public Review laws, and in sundry provision of advice, interpretation, and commentary. [Example at Exhibit 15]

98.   From approximately 1955 – 2006, a period of >50 years, Peter Knight actively contributed to the drafting of electrical laws in Canada.

99.   Electrical law is cumulative.  That is, the core of the law, as drafted in the 50's – 80's, is largely unchanged iteration to iteration.  Electricity doesn't change, so the basics of electrical regulation are largely unchanged.

100.  As a result, new editions of the Code are rarely more than 2% altered from the edition immediately previous.

101.  As part of our defences against CSA's various litigations against us, we ran several versions of electrical law through plagiarism detection tests, to gauge how much of one edition is carried over to the next edition.  The results confirmed that average carry-over from one edition to another is ~98%.

102.  In example, the 2012 edition compared to the previous edition contained exactly 98% identical text.

103.  Certain core sections of electrical law see even less change.  In 2015 for instance, the sum of text in Sections 30 – 38 is 20,990 words, of which 20,640 words are carried over from 2012.  Again from 2012, Sections 60 – 86 carried over 99.41% of law from previous editions.  New text in Sections 10 – 18 in that same edition amounted to just 0.87%, and just 0.71% in Sections 30 – 38.

104.  Indeed, there remains text in the 2018 Code (the most current edition) dealing with coal access doors which has remained unchanged since 1927.

105.  One may appreciate how galling it was to hear CSA testify in Canadian Federal Court that each iteration of electrical law is in no way subsidiary to previous editions but, rather, each is a stand-alone publication.

106.  It is more galling still to read CSA's filing to this Court, claiming the opposite, that each iteration of Code is a subsidiary edition of the previous Code.

107.  The Canadian Civil Service claims are not based on truth, but what they expect will move the Court.

108.  The sum of Peter Knight's contribution across six decades of electrical law, critically during the formative era of the drafting of electrical law, is approximately 5% of the current text of that law.

109.  On May 30, 2015, Peter Knight signed a copyright assignment covering all of his contributions to electrical law to PS Knight Co Ltd. [Exhibit 13]

110.  The Canadian Civil Service however, only started collecting copyright assignments in 2010, and only from those persons who had contributed in that year.

111.  Thus, in Code years 2012, 2015 and 2018, and counting spillover contributors from 2009 who signed CSA assignments in 2010, the Canadian Civil Service has, at best, copyright assignments covering four Code cycles at ~2% of Code text per cycle.

112.  In other words, the sum of CSA's copyright assignments cover no more than 8% of the text of Canadian electrical law.

113.  At P.5, Para. 12 of the Civil Service filing, PS Knight Co Ltd is claimed to be owned by PS Knight Americas Inc.  This is incorrect.  Certain of the assets of the former were purchased by the latter, but the entities are distinct and neither are subsidiary or owner of the other.

114.  The Canadian Civil Service filing also bloviates at length that Knight's Code is a complete copy of Canadian electrical law.  Yet under Alberta Queen's Printer Copyright, we are required at law to ensure that electrical law is reproduced with entire accuracy, exactly as passed into law.  This is the nature of law; we have no authority to alter the text of law in our own authorized reproduction of it.

115.   Our publications, including the Knight's Code publication, are fully compliant with Alberta's Queen's Printer Copyright law.

116.  Specifically, this law states as follows; [Exhibit 12]

> *"Alberta Queen's Printer holds copyright on behalf of the Government of Alberta in right of Her Majesty the Queen for all Government of Alberta legislation. Alberta Queen's Printer permits any person to reproduce Alberta's statutes and regulations without seeking permission and without charge, provided due diligence is exercised to ensure the accuracy of the materials produced, and Crown copyright is acknowledged in the following format:  © Alberta Queen's Printer, 20___"*

117.  The Queen's Printer Copyright acknowledgement is found on the inside cover or first page of each of our publications, in full compliance with Alberta legislation governing the reproduction of all laws, including electrical laws. [Exhibit 16]

**PRIVILEGE**

118. On May 16, 2016, the Canadian Civil Service filed an affidavit with the Federal Court of Appeal which pedantically and histrionically, and at considerable length, expounded on their experiences negotiating with PS Knight.

119. All of the details the Canadian Civil Service included in their filing were privileged.  In bitter irony, it was the Canadian Civil Service which had insisted on keeping all such detail privileged.

120. In Court the CSA claimed an honest mistake in including all of these cherry-picked particulars, however implausible that may be.

121. Justice Gleason Ruled that it was indeed a breach of privilege to breach privilege, and she struck thirty-one paragraphs from the Canadian Civil Service' affidavit.

122. Of course, the one-sided characterization of PS Knight from these cherry-picked particulars was registered with the Judge prior to expunging them, and that appears to have been the whole point of the Canadian Civil Service in including them.

123. Again, the Canadian Civil Service can breach whatever they wish to their tactical advantage and, apart from striking some paragraphs, Courts in Canada hand their colleagues no consequence.

124. As the Canadian Court does not seem terribly concerned by Canadian Civil Service conduct on the matter, and as the Civil Service is already on record waiving privilege in these litigations, we are content to accept their decision and to conduct ourselves

accordingly and in liberty to disclose as we deem appropriate in this filing and elsewhere.

**HOW ELECTRICAL LAWS ARE DRAFTED**

125.   On the content of electrical law, the members of CSA committees pay money to the Civil Service to purchase the right to draft the laws that the rest of us have to abide by.

126.   The practice of trading money for influence over legislation is usually referred to as bribery.

127.   PS Knight was approached by CSA on three occasions, offering to "sell" us influence over the drafting of electrical legislation.  We declined all such offers.

128.   The Canadian Civil Service actually advertised these influence sales online for a short time before someone in management thought it prudent to conceal this activity. [See screenshot samples at Exhibit 17 & 18]

129.   In Canada this practice constitutes a breach of several Sections of the Canadian Criminal Code (notably Sec. 120, 121(1), 122 and 463) and, in influence sales to foreign nationals, a breach of Sec. 46.2(b) and (e), 46.3(b) and 46.4.4.

130.   In the United States, as CSA is actively selling influence over Canadian domestic law in the US, the practice is a breach of the Foreign Corrupt Practices Act and various states' RICO laws.

131.   These influence payment amounts are floating, based on market demand for limited seats on committees.  While Civil Service advertisements show high-end of range

payments of "$6,000+", we are advised from multiple sources that the plus symbol in practice means payments of >$30,000 per bribe. [Exhibit 17]

132. The Canadian Civil Service admitted to receipting "$60 - $70MM" per year in influence payments in an internal Civil Service advertorial [Exhibit 19], with this figure confirmed through a PS Knight Access to Information filing at Industry Canada [Exhibit 20].

133. In practice then, in charging bribe amounts to each contributor of content, the Civil Service is making a net profit on Code development before a single copy has been printed.  In this structure, the Canadian Civil Service is taking money on both ends of the development cycle, leaving them with no development costs at all.

134. One should note that the Canadian Civil Service has lied to Court repeatedly on the question of development costs of the Code.  In 2017 for instance, CSA employee David Zimmerman testified that Code development costs were about $100k.  Twenty-four hours later, the Civil Service furnished the same Court with a different answer.  Now Code development costs were $330k.  Elsewhere in the same Civil Service filing, Code development was listed as $1,096,000.

135. Further, the Civil Service claimed that posting one document on the Government website for purposes of compliance with Public Review law would take 300 hours of time and cost $71k.  They also claimed it would cost $450k for a project manager to intake public comments for 60 days.

136. Canadian Civil Service statements have no credibility.

137. One should also note with regard to CSA committee payments, and in passing, that as of 2016 the trading money for influence over domestic law is no longer a crime in Canada. To shield the Canadian Civil Service from prosecution, Ontario Provincial Court's Quamina Ruling of 2016 legalised the trading of money for influence by civil servants.

This Ruling was upheld by Ontario Superior Court (Justice Norheimer) in 2017.  The subject of both Rulings was CSA's money-for-influence practices specifically with regard to the drafting of electrical law.

138.   The drafting of electrical laws in Canada, and the other ~2,000 laws drafted by CSA, has been monetized.  The Canadian Civil Service is treating the legislative process as a profit center, and any entity putting this payments operation at risk is targeted for elimination. Hence, their lawsuit against PS Knight Americas Inc.

**CIVIL SERVICE COUNTERFEITING OPERATIONS**

139.   In an eight-year period, 2003 – 2010, the Canadian Civil Service was selling counterfeit safety certifications for consumer products.

140.   The products illegally certified did not meeting the minimum safety standards for importation into Canada.

141.   That is, CSA was issuing safety certifications for use in importation of consumer products over which it had no lawful authority to certify and, compounding matters, those unlawfully certified products did not meet the requirements CSA was certifying that they'd met or exceeded.

142.   All this was outed in a news story in 2010 by the Canadian Broadcasting Corporation.

143.   A variety of companies were victimized by CSA, by unwittingly making commercial-scale purchases of consumer products for import and resale that could not in practice be imported or resold or, in some cases, used at all. [See specimen legal letter at Exhibit 21]

144. Canadian Civil Service counterfeiting bankrupted several companies in both Canada and the United States.

145. To date, the Canadian Civil Service has declined to indemnify any of the victimized companies or the end users. [See public warning re fraudulent certifications at Exhibit 22]

146. Other entities of the Civil Service, such as the Standards Council of Canada, Industry Canada, the Competition Bureau, or the Department of Justice, have declined to investigate the conduct of their CSA civil service colleagues.

147. In bitter irony, in 2006, at the height of CSA's counterfeiting activities, the Civil Service founded the Canadian Anti-Counterfeiting Network (CACN), purposed with lobbying governments to enhance the anti-counterfeiting authorities of the Canadian Civil Service.

148. These authorities include the training of Canada's border guards on how to spot counterfeit products.

149. To the best of our knowledge, none of CSA's counterfeit products were spotted by the border guards they trained for this purpose.

150. If it's not already clear, this supposedly discrete copyright case is actually part of a much larger and longstanding Civil Service corruption problem.

**MANSON'S LAW**

151.   At Pg.3, Para.6, of the Civil Service filing they note the Manson's Law Ruling.  We
consider Manson's Law, the T-646-15 litigation and Ruling, as a particularly egregious
example of Canadian Judicial corruption.

152.   According to Manson's Law, "it would be contrary to the purposive construction of the
Copyright Act to strip" private parties of their ownership rights in the text of law "simply
because certain provinces have" passed it into law. [See CSA filing P.161 (though not
marked as an Exhibit and is missing page numbers) and P.180 (the CSA exhibit pages
appear out of order)]

153.   On December 7, 2018, the Federal Court of Appeal upheld Manson's Law, saying; "As
long as it is original, any writing may be the subject of copyright in Canada.  This would
include laws and regulations."  Further;  "That law and regulations may be the subject of
copyright is indeed recognized." [See CSA filing Exhibit F, P.188]

154.   In contrast, the governing law prior to Manson's Law, and by decision of the
Government of Alberta the governing law over certain aspects of copyright at present,
was and is Alberta Queen's Printer Copyright.  [Exhibit 12]

155.   This Copyright states as follows;

*"Alberta Queen's Printer holds copyright on behalf of the Government of Alberta
in right of Her Majesty the Queen for all Government of Alberta Legislation.
Alberta Queen's Printer permits any person to reproduce Alberta's statutes and
regulations without seeking permission and without charge, provided due
diligence is exercised to ensure the accuracy of the materials produced, and*

*Crown copyright is acknowledged in the following format:  © Alberta Queen's Printer, 20__."*

156.  Kindly note that we complied completely with Queen's Printer Copyright.  No Court has declared otherwise about us. [Exhibit 16]

157.  This entire shambolic nine-year legal saga is the result of our *obeying* the law, and the Civil Service *violating* it.  Think about that.

158.  We have extensively researched the background to the Manson's Law Ruling.

159.  We found that prior to his appointment to the Federal Court, Justice Michael Manson spent his career at the law firm of Smart & Biggar, eventually rising to Managing Partner.  He arrived there in 1982 and left for the Bench in 2012.  That's thirty years.  That's important, because Smart & Biggar has a multi-decade relationship with CSA.

160.  When CSA launched the Canadian Anti-Counterfeiting Network (CACN) in 2006, Smart & Biggar was a charter member.  [Exhibit 26]

161.  The CACN is, in practice, a front for CSA and its allies, used to increase their lobbying strength in Ottawa.  The CSA describes itself as the "driving force" at CACN, it funds the CACN, it staffs the CACN, it *is* the CACN. [Exhibit 28 P.13]  It's just designed to look like it's something else.

162.  Michael Manson's law firm was a regular attendee at CSA events, for years.  As recently as 2016 for instance, Smart & Biggar was an exhibitor at CSA's "Reality Tour," a sort of insiders' conference.  The "insider" part is emphasized.  Of the twelve exhibitors, five were CSA and their associates. [Exhibit 24]

163.   Again, this time in 2013, Manson's firm made presentations on "Battling Unsafe Counterfeit Electrical Products" at the ESFI conference.  The Smart & Biggar contribution was made by Brian Isaac.  He was then the Chairman of CACN.  He co-presented with Terry Hunter, a Manager at CSA.

164.   Brian Isaac oversaw the destruction of evidence at CACN in the wake of RestoreCSA articles on CSA counterfeiting.  Brian Isaac was also the writing partner of Michael Manson.  When one of these wrote an article, the other was the media contact for inquiries, and vice versa.

165.   This ESFI conference was held at "5060 Spectrum Way, Mississauga ON."  That's a CSA address.  That's right, Manson was attending conferences inside CSA's own offices.

166.   Along with CSA, Smart & Biggar was a presenting exhibitor at the International Law Enforcement IP Crime Conference.  Both Michael Manson and Brian Isaac made presentations.  Also in attendance was CACN, Kestenberg Siegal Lipkus (CSA contractor), the Motion Picture Association (on the Board of CACN), the International Anti-Counterfeiting Coalition (partnered with CACN), etc.  Six of the thirty-one representatives at the conference were CSA and their associates.

167.   Michael Manson and Brian Isaac worked together as co-counsel on cases, they co-authored articles, they presented together, attended the same CSA conferences, etc.

168.   In 2013 and 2014, RestoreCSA began a series of reports on
CSA's counterfeiting activities.  We explored the background of CACN as a CSA front organization.  We asked why a leading "anti-counterfeiting" entity was being run by a leading counterfeiter, as the Canadian Civil Service had by this time been outed by the

Canadian Broadcasting Corporation for running an eight-year long counterfeiting operation.  We published extensive links to evidence of these relationships.

169.  Whenever we published a new RestoreCSA article with damning detail, Manson's writing partner at CACN oversaw that the evidence we quoted was deleted from CACN's website.  After one such article, containing a large number of such linkages, they deleted the entire CACN website. [Exhibit 27]  When it went back online again a week later, the site had been washed of anything incriminating.

170.  The word "incriminating" is important here.  The CSA and its affiliates were authorized by the Federal Government during Michael Manson's tenure in the Civil Service to train Canada's customs officers in identifying counterfeit certifications.  We are advised that none of CSA's own counterfeit certifications were identified by the officers trained by CSA.

171.  Reporting on Civil Service counterfeiting activities puts a lot of people in legal jeopardy.  Anyone with involvement could face prosecution, including Michael Manson.

172.  The relationship between Michael Manson and Smart & Biggar was still going strong long after Manson was appointed to the Bench.  At the 2014 Intellectual Property Owners Association conference, two years after Manson's appointment, both Michael Manson and Brian Isaac were presenters on the same issues. [Exhibit 29]

173.  They were also co-signatories on the same letter to the Canadian Bar Association (CBA) in 2012.  It was a complaint letter.

174.  However ironic, the letter notes that recent conduct "may have fallen short of the CBA's well established standards for transparency, objectivity, balance, and avoidance of

conflict" and the CBA President was called "to ensure that the CBA's reputation for integrity and even-handedness is not diminished by failing to take adequate precautions in a contentious policy debate."

175.  In 2008, Michael Manson was interviewed for an article featuring CSA's CACN.  Recall that CACN is a creation of CSA.  Manson told the interviewer that "the Canadian government is not doing enough to protect businesses and consumers."  That is, he wanted more power to enforce Civil Service priorities.  Then he told them that, "the Canadian Anti-Counterfeiting Network was formed in 2005 to lobby the government for changes in laws."  [Exhibit 30]

176.  Also note that the changes in question, in part, would be the power to define what is or is not counterfeit and to train border guards to spot counterfeits on this basis.  The Civil Service succeeded, their CSA branch was given that power.  By 2012, the CACN was "training" 50 border guards per year, and they were starting to "train" the Canadian Federal Police (the RCMP) as well.

177.  In another article about CACN, both Michael Manson and Brian Isaac gave interviews praising the CSA's increasing power.  "Two of the chronic problems with the current regime," said Manson "are that the Trademarks Act is inadequate to deal with counterfeit issues and Customs officials lack the authority to target, detain, seize and destroy counterfeit goods. […] The result is that any enforcement at Customs is on an ad hoc basis and requires the intervention of the Royal Canadian Mounted Police in order for any detention and destruction to take place. The result is ineffectual enforcement, if any, at the Canadian borders."

178.  The article closed the circle; "Customs' powers are therefore central to the recommendations made by CACN".

179. Justice Manson is on record, and quite extensively, working with CSA personnel, praising CSA initiatives, and pushing through CACN for new and expanded powers for CSA.  All of this activity was focussed on anti-counterfeiting powers for CSA during the same period that CSA was doing all of their own counterfeiting.

180. In small matters, as in large ones, the relational closeness between Smart & Biggar and CSA is well evidenced.  For instance, the routine exchange of staff between CSA and Manson's firm is verifiable through LinkedIn profiles.

181. The CSA and Smart & Biggar even source the same Christmas cards. [Exhibits 31, 32 & 33]

182. Michael Manson was also employed by CSA.  Not as a lawyer on contract, although that may have happened too.  Rather, Michael Manson was directly employed by CSA.

183. In a June 25, 2007 interview with the Regina Leader-Post, Michael Manson admitted to serving on one of CSA's counterfeiting committees.  Specifically, an enforcement committee.  And it was accurately described as a committee of a Government Agency in the article.  And the article contains more than one such admission regarding these committees.  One of these admissions reads as follows;

184. "Michael Manson works hard with Canada's Anti-Counterfeiting and Enforcement Committee to raise alarms on safety issues." [Exhibit 25]

185. Said Mason; "Even CSA marks […] are being knocked off."  [Exhibit 25]

186. But Manson goes further, giving CSA an advertisement for their services;  "CSA marks […] mean that a product has been tested and meets the international standards for safety and / or performance".  [Exhibit 25]

187. Then, like any good pitchman, he hammers the consequences of not using CSA marks;  "You buy electronic goods, they don't have the right copper wire, you plug it in, your child is playing downstairs and the house goes up in flames."  You see, if you don't work with CSA you'll lose your house and your child will die.  [Exhibit 25]

188. Is that sufficiently objective for a Judge between ourselves and CSA?

189. In Court, we found it odd that, in frustration, Manson went out of his way in his Ruling to declare CSA a private company.  You see, at that point we had yet to research him.  Declaring CSA a private entity is the opposite of Government statements on the matter and, of course, the archival record of CSA as a Civil Service entity, and it defies CSA's actual Government charter, and it had nothing to do with the subject of the Hearing.  But Manson felt a need to make such a declaration.

190. In his Ruling, in addition to Manson's bizarre conclusion that public law doesn't exist, he declared the "conduct" of PS Knight Co to be "certainly questionable" and the contents of the RestoreCSA website to be "scornful and derisive."

191. Neither of these comments were relevant to the case but they might've been relevant to Manson personally.  After all, the RestoreCSA articles were exposing criminal activity in the Canadian Civil Service, specifically in a branch of that Service in which Manson had close, long, and verifiable relationship, and specifically in those areas of CSA under greatest criminal suspicion.

192. As one colleague put it, "by his comments it appears that [Manson] took the CSA case personally," as though he had a personal stake in it.

193. Manson's Ruling also featured a massive financial charge to PS Knight.  In a Supplemental Judgement, Manson ordered PS Knight to pay six figures to CSA, in part because of PS Knight's "novel and unusual defences."  We complied with Queen's Printer laws.  They're neither novel nor unusual.  But the Judgement had the capacity to destroy PS Knight Co.

194. If we were destroyed, RestoreCSA would be silenced.

195. If that happened, anyone complicit in CSA's counterfeiting would be less vulnerable to prosecution, like Michael Manson for instance.

196. We furnished the Office of Canada's Chief Justice Paul Crampton with the evidences of Michael Manson's relationships within the Canadian Civil Service, specifically with CSA, and the evidences of that entity's counterfeiting activities as originally reported on RestoreCSA.com.

197. Chief Justice Paul Crampton's office was therefore asked in May, 2017 what they planned to do with Justice Manson, given the overwhelming evidence of conflict of interest breaches and the scale of disciplinary powers available to Crampton's office to remedy them, and his defined legal obligation to engage those disciplinary powers.

198. Andrew Baumberg, an official in Crampton's office, advised that Crampton intended to do nothing about the conduct of Manson.

199. Baumberg also noted in his responses that it was actually the Office of the Chief Justice itself which specifically selected Michael Manson to judge between ourselves and his employer.

200. It is worth noting that Justice Crampton is apparently known inside the Civil Service by the nickname "Kangaroo Crampton."

201. We understand that this nickname stems from a speech Crampton gave in to the Canadian Bar Association in 2014, long before we had heard of Crampton, in which he lamented the public growing perception of Canada's Federal Court as a Kangaroo Court. [Exhibit 23]

202. Apparently the Civil Service thought Crampton's speech was amusing, as they regarded his Court as exactly that; a Kangaroo Court "willing to jump as high as the Federal Government says."  That has surely been our experience in Canada's Federal Court also.

203. It should further be noted that Manson's Law is ignored entirely by the Canadian Civil Service when their friends and colleagues are in breach of it.  Electrical Line Magazine for instance, excerpts rather large sections of electrical law in their articles every month, and all without attribution or payment of royalty.  Yet because Electrical Line is dominantly an advertising forum for CSA members, it endures no penalty. [Sample at Exhibit 42]

204. Likewise, there have been a great many books published which reproduce the greater part of electrical law and which neither attribute to CSA nor pay them a dime for the right to reproduce under Queen's Printer Copyright.  None of these other publications has been subjected to any Canadian Civil Service litigations whatsoever.  [Samples at Exhibit 43]

205. Michael Manson is a crooked Judge.  Trial rigging is a major crime.  Complying with Queen's Printer copyright is not at all a crime.  Yet we're the ones Canadian Courts are going after?

**UNITED STATES SUPREME COURT RULING**

206. As PS Knight Americas Inc is a US entity, registered in Texas, the CSA's claim to own the law is subject to US Court Rulings on the matter.

207. On April 27, 2020, the United States Supreme Court Ruled in Georgia et al. v. Public Resource.Org, Inc. that law, in its nature, cannot be owned. [Exhibit 34]

208. According to the Supreme Court Ruling; "No-one can own the law," and again; "Officials empowered to speak with the force of law cannot be the authors of the works they create in the course of their official duties."

209. As the Canadian Civil Service has already admitted in their filings to this Court that they have authored certain of the text of Canadian Electrical Law, under this US Supreme Court Ruling the CSA cannot be considered the lawful owner of the Electrical Code within the United States.

210. Quoting from the Ruling, as drafted by Chief Justice Roberts, and as referring to the State of Georgia equivalent of CSA; "The Commission is not identical to the Georgia Legislature, but functions as an arm of it for the purpose of producing the annotations. The Commission is created by the legislature, for the legislature, and consists largely of legislators."

211. The particulars of this statement are identically applicable to the Canadian Civil Service.

212. Consider by quotation the ramifications of permitting civil servants to actually own the text of their legislative activities;

*US Supreme Court – "States would be free to offer a whole range of premium legal works for those who can afford the extra benefit."*

*Canadian Civil Service – "[Selling] the ability to build your own customized online collection of standards or access to our pre-build collections for best value."* [Exhibit 35]

*US Supreme Court – "A State could monetize its entire suite of legislative history."*

*Canadian Civil Service – "Looking for a suite of standards in a given subject area?"* [Exhibit 36]

*US Supreme Court – "States might even launch a subscription or pay-per-law service."*

*Canadian Civil Service – "[Purchasers] benefit from access to up-to-date standards, whether purchased individually or as part of a collection".* [Exhibit 35]

213. Damningly for CSA, even the Supreme Court dissenting Opinion, authored by Justice Ginsburg, agreed with the basic argument, saying; "Beyond doubt, State laws are not copyrightable."

214. While the judicial systems of both Canada and the United States are imperfect, as are all such systems peopled by people, and while the US system has influences of corruption within it, as do all such systems, the Court system in the US is less compromised than the Canadian system as regards unlawful civil service influence.  Much of this is due to scale.  The US is about ten times' the size of Canada, and larger systems are more difficult to corner than smaller ones.

215.   The Canadian Court system is rig-able and influenceable by civil servants without
       penalty.  That's how Canada got Manson's Law while the US has public law.

216.   Critically however, PS Knight Americas Inc is a US entity, not a Canadian one, and is
       under US law on all matters, including matters of copyright.


**PROCEDURES AND LOGISTICS**

217.   The Canadian Civil Service claim before this Court is part of a much larger civil service
       corruption issue and is tactically part of CSA's effort to financially eliminate PS Knight.

218.   The claim before this Court is the seventh litigation started by CSA against us.

219.   In each Civil Service litigation against us, their lawyers lobby their Civil Service colleagues
       in the Court Administration Service to approve bifurcations of their cases into multiple
       subsidiary cases, effectively reduplicating further their seven litigations.

220.   The repeated bifurcation of CSA's original T-1178-12 litigation was done at the
       insistence of the Canadian Civil Service, with the connivence of the Civil Servants of the
       Court Administration Service, in defiance of the emphatic objections of our legal
       Counsel.

221.   The whole point of duplicating Court processes is to financially harm an opponent.
       There have now been six distinct, yet word-for-word identical litigations in Canada that
       the Civil Service has started against us, most of these further bifurcated by sub-motions
       and their respective hearing processes.

222. The Federal Court of Appeal, under Justice Gleason, called out the Civil Service -a rarity, indeed- for what she called "such similarity," indeed "the paragraph for paragraph duplication" of the Canadian Civil Service' various cases against us.

223. On July 25, 2014, we had a one-on-one negotiation with CSA CEO Ash Sahi.  He threatened that if we didn't sign over ten percent of our revenues to the Civil Service, they would bury us in "waves of lawsuits" and would try to "cause [your] legal bills to reach $1MM" in the following year.  [Exhibit 4]

224. Recall the Canadian Civil Service waiving of privilege [Para.114 - 120], hence our latitude in such quotation.

225. We declined to pay the protection money.

226. There has been no Court that has Ruled that PS Knight has broken the laws that applied at the time of any of our publications.  Rather, the Court in Manson's Law, and those Courts which upheld it, have Ruled that the Queen's Printer Copyright law means the opposite of what it says it means.

227. We did not violate the law; the Court altered the meaning of law after the fact.

228. We also remind this Court that even under Manson's Law, PS Knight holds copyright on ~5% of the Code, based on our copyright assignment covering our >50 years of contributions to the text of law. [See Para. 78 & 79]

229. In testament to the solidity of the PS Knight copyright, and in the context of Manson's Law, in February 2018 several Members of Parliament (MPs) agreed to participate in a free public distribution of ~100 copies of Knight's Code from their Parliamentary Offices.

230. The participating MPs were the Hon. Maxime Bernier, Arnold Vierson, Tom Kmiec, Larry Maguire, and Len Webber.

231. Are these MPs criminals also?

232. We also note that the Canadian Civil Service' Motions in Canada still list Peter Knight as a Defendant.  Peter Knight died more than four years ago, and Government Counsel was advised of this on the same day he died.

233. Clearly, a deceased person is not a current defendant.

234. It is worth noting that Peter Knight was very retired at the start of the Civil Service' litigations.  He had sold his business in 2009 / 2010, two years prior to the start of the 2012 action.

235. The Civil Service was well aware of this, though they would not release Peter Knight from their litigations.

236. When pressed, negotiators for the Civil Service committed to release Peter Knight on three occasions.  The Civil Service broke their commitments to do so on each occasion.

237. The CSA CEO, Ash Sahi, in 2014 explained these Civil Service tactics, as; "we're going to keep hurting your father until you give us what we want." [Exhibit 4]

238. When the Civil Service learned that my father was rapidly declining in hospital, they continued to sue him in his hospital bed.

239.  When my father died, we informed the Civil Service through our Counsel.  We requested, and they agreed, to "lay off for a couple of weeks" as there was nothing urgent or immediately pending, so that we could get past the funeral period.

240.  The Canadian Civil Service broke their commitment and issued new Court filings on the morning of his funeral.

241.  On May 11, 2017, in the midst of the Canadian Civil Service' litigations against us, a Canadian Bar Association conference took place.  The highlight of the conference was a 2-hour Town Hall Meeting featuring high-profile panelists. [Exhibit 37]

242.  Six of the seven members on the panel were up to their necks in the Canadian Civil Service' litigations against PS Knight (Chris Van Barr, Paul Crampton, Michael Manson, Roger Lafreniere, Mireille Tabib, and Denis Martel).

243.  The panel included the Federal Department that CSA reports to, the Court official managing the case, the Court official handling the JDR on the case, the Judge who gave the Civil Service Manson's Law, the Justice who orchestrated the whole thing, and all moderated by the CSA's outside law firm.

244.  One is reminded of US civil servants Peter Strzok and Lisa Page barbecuing with Justice Contreras at the latter's residence, all while sending Motions before that same Judge. The social circle in the Canadian Civil Service evidenced in where these people congregate after hours is illuminating.

**LYING TO COURT; LYING TO THE PUBLIC**

245. On July 31, 2018, the Canadian Civil Service posted a "Safety Alert" on their website regarding our Code book, claiming that our book contains 180 serious errors.  [Exhibits 38 and 39]

246. On the CSA's public safety posting; "We have concerns that these [180] differences raise urgent safety issues to electrical professionals, the public at large and property owners if this document is used".

247. In Court filings, the Canadian Civil Service declared that the 180 differences between our book and theirs made our book quite dangerous.  Knight's Code "poses urgent and serious public safety concerns," so serious that the Court should act against PS Knight quickly, "given the urgency and seriousness of the situation."  Our book will "increase the risk of shock" and "give rise to a serious public safety concern," including "risks of serious property damage, bodily injury and even death."

248. Among the 180 differences between our book and theirs that the Canadian Civil Service identified as major dangers to public safety were the CSA word "wastewater" vs. our words "waste water," the CSA word "subrule" vs. our words "sub rule," and the CSA index format of "Subrule (8)" vs. our "Subrule 8)".

249. Other differences include the use of two-column format vs. the Civil Service' single column, and various differences in how each book highlights section headings.

250. In December 2018, the Federal Court Ruled that CSA's 180 "urgent safety issues" weren't serious at all.

251. Specifically, the Court Ruled that CSA "raised serious safety risks [but] the evidence provided to that effect is not compelling."  Further, "the vast majority of the differences the CSA characterized as material appear to be small grammatical edits or minor changes the CSA did not highlight in its [own] 2018 Code."

252. In defiance of this Ruling, the Civil Service kept their public safety warning on their public website for the next two years, and it remains there at present.

253. The Civil Service has lied to Court, lied to the public, and lied to the electrical trades community by characterizing our books as not only worse than theirs, but so much worse as to be dangerous to public health.

254. Yet the truth is that CSA knows our books to be not merely as good as theirs, but better.

255. On June 27, 2014, during negotiations with Bonnie Rose, President of Standards at CSA, she volunteered that "Frankly, your books are better than ours."

256. That's the truth the Civil Service knows; but it's the lies of the Civil Service the public reasonably believes, and these mar our reputation, constrict our sales, and badly damage our financial viability.

257. On December 10, 2020, the Canadian Civil Service sent "An Important Message from CSA Group," warning that PS Knight had been advertising an illegal product.  [Exhibit 40]

258. Specifically; "Please be advised that despite PS Knight's fraudulent claims, the advertising and sale of the Knight Code is unauthorized and unlawful."

259. Again, authorization is already dealt with in this filing, and there is no injunction or impairment of PS Knight Americas Inc, the publisher of Knight's Code, whatsoever.

260. The CSA continues; "Such [PS Knight] actions are in direct violation of the Federal Court of Appeal's decision."

261. Again, this is untrue.  The referenced FCA decision was in relation to PS Knight Co Ltd, an Albertan entity, and dealt with the 2015 Code edition, not the 2021 edition CSA in its notice refers to.

262. Further, the current Canadian Civil Service claim before this Court is the only litigation that has ever faced PS Knight Americas Inc.

263. In other words, CSA is knowingly spreading false information about PS Knight Americas Inc throughout our market in an attempt to harm our business and our reputation.

264. Canadian Civil Service practice of lying to the public is likewise witnessed in Court.

265. Recall that CSA is on recorded as a tenant as a subsidiary of Canada's Department of Industry and Trade in a variety of government buildings, year after year, for decades. [Para. 38]

266. Yet Mr. Doug Morton, the CSA Director of Government Relations and their Witness at Discovery during the entire 2012 – 2020 period, specifically denied that CSA had ever occupied any Government facility whatsoever.

267. While the Canadian Court system is influenceable by civil servants due to the Court Administration Service being run by the Civil Service, the US system is not as influenceable by Canada.  In this, while CSA can routinely arrange Rulings to its liking in Canada, in the US the CSA tends to endure more objective scrutiny.

268.  Given the Canadian Civil Service' statements in this filing, the Ruling in Hale v. Enerco Group Inc, of US District Court, N.D. Ohio, Eastern Division in 2011 is relevant.

269.  From the Ruling, "Enerco and CSA conspired to defraud Plaintiffs by falsifying the testing of the product."  [Exhibit 41]

270.  Then Justice Polster lectures the Civil Service on what the Court means by fraud, as follows;

> *The elements of fraud are: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.*

271.  Then, from the Ruling; "Upon careful review of the First Amended Complaint in its entirety, […] the Court finds that Plaintiffs have satisfied all of the pleading requirements imposed by Rule 9(b) and have sufficiently pled the elements of fraud."

272.  In this instance, the Canadian Civil Service had issued fraudulent misrepresentations concerning the safety of certain space heaters that CSA had been contracted for testing. The Canadian Civil Service had falsified the testing itself, then the test results, then issued falsified certifications as to the safety of the heaters.

273.  The Plaintiffs in Hale v. Enerco noted that the fraudulent conduct of the Canadian Civil Service had caused much injury, having "severely burned people -including children."

274.   Consider the language used by the Ohio Court;

> *"On May 12 and May 19, 2005, at CSA's facility, Enerco and/or CSA deliberately altered a vent-free heater co conceal an unsafe defect for testing purposes, and CSA falsely certified the heaters as safe; Enerco and CSA intended their false representations about the safety of Enerco's heaters to mislead merchants and Plaintiffs, as consumers, on product packaging, in product literature, and during advertising; Plaintiffs, as consumers, justifiably relied upon Enerco's and CSA's representations about the safety of the heaters; and Plaintiffs were injured economically by purchasing the unreasonably dangerous heaters [...] Further, the Court finds that Plaintiffs have sufficiently pled the elements of conspiracy to defraud.  Plaintiffs have alleged that Enerco and CSA deliberately agreed to alter the heaters, falsify testing results, falsely certify the heaters, and incorporate this false certification into Enerco's product packaging and other promotional materials with the intent to mislead merchants and Plaintiffs, as consumers."*
> [Exhibit 41]

275.   Note that Justice Manson characterized CSA's testing activities as a hallmark of their high character [Para. 186].  The difference in assessment is notable.

276.   The Canadian Civil Service, and its enablers throughout the Civil Service, has a long and unfortunate record of making "false representations" to Court.  As noted, their current filing in this Court is no exception.

**COURT RIGGING, CON'T**

277.  Mason's Law is not the only arranged Ruling we have been subjected to.

278.  Recall that the Canadian Civil Service stated their intention to use baseless legal proceedings to bankrupt us.  [Para. 217 & Exhibit 4]. Compelling us to pay for legal fees was the whole point of litigating in the first place.

279.  After nine years of defending against multiple duplicate litigations, we were depleted of resources and could no longer afford legal representation in Court.

280.  The Canadian Civil Service however, argued to their Civil Service colleagues in the Court Administration Service that if we could not pay for legal counsel, then we should be denied the right to defend ourselves entirely.

281.  On Feb 4, 2020, Canadian Federal Court Prothonotary Mireille Tabib Ruled in favour of her colleagues that we are disallowed the right of defence in the various Civil Service litigations against us.

282.  Then the Canadian Civil Service filed a Motion for Default Judgement against us.

283.  The purpose of the Canadian Civil Service' Default Judgement Motion is to foreclose on their T-1178-12 claim without the fuss and bother of a Trial, or even a Hearing, without the trouble of proving their claims, or hearing from witnesses, or to have any Court hear from the Defendants.

284.  As their Motion was against the company and myself personally (Gordon Knight), I filed a Response with the Court.

285. On Oct 29, 2020, the Prothonotary Ruled that the Response may be filed but only "under reserve of any objection by the Plaintiff [CSA] as to whether Mr. Knight is permitted to respond to a Motion for Default Judgement."

286. That is, the Plaintiff was granted the authority to overrule the defence of their opponent.

287. Then it got worse;  "The remaining documents [evidence files] may not be filed as they are not properly filed as evidence".  So, the Prothonotary removed the evidence from the filing.

288. The evidence pages were properly filed through the Courts electronic filing portal, just as the Response itself was, and indeed at the same time, but I was denied an appeal on the matter.

289. The Canadian Civil Service then responded to their Court colleague, saying that; "CSA does not consent to Mr. Knight filing this document or being permitted otherwise to participate at the hearing of CSA's motion," and; "Neither the corporate defendant [PS Knight Co Ltd] nor Mr. Knight is entitled to respond to or contest CSA's motion."

290. The Canadian Civil Service' main argument to Court for disallowing our Response filing was that "the balance of [Knight's] materials contain bald assertions of fact [...] unsupported by any sworn affidavit evidence in Mr. Knight's responding materials."

291. As noted, the reason there was no evidence is because the Court removed it. [Para. 280]

292. The Canadian Court Administration Service, via Prothonotary Tabib, rubber stamped their Civil Service colleagues request, Ruling that our entire Response to their Motion for

Default Judgement was struck from the record and that I was not entitled to so much as "speak" at the Hearing to decide my fate and that of my company.

293. On Nov 10, 2020, the Canadian Civil Service entities, the CSA and the Court Administration Service, held a private meeting to decide together what the Court would be recorded as Ruling in the matter of CSA v. PS Knight Co Ltd.

294. They have yet to publicly release their decision.


**FIVE YEARS IN PRISON**

295. Subsumed within the Canadian Civil Service' T-646-15 litigation is their Motion from April, 2019 that I personally be found in Contempt of Court.

296. For background, within the T-646-15 process, both parties had interest in awaiting the Federal Court of Appeals (FCA) Ruling and, in this context, both parties signed an Agreement, registered with the Court, to pause the 646 process until the FCA decision.

297. According to the Agreement, upon receipt of the FCA Ruling, both parties were to advise the other of their response to that Ruling and how they intended to proceed.  There was no further compliance requirement within that Agreement.

298. We complied with the Agreement.

299. The Canadian Civil Service however, has chosen to ignore the Agreement and instead claim that the 2018 Code is essentially the same document as the 2015 Code, such that the injunction under Manson's Law applies regardless of what the text of the Agreement actually says.

300. That said, Manson's Law prescribes that I personally am not targetable by the Civil Service, they may only target PS Knight.

301. Notwithstanding both of these realities, according to the Canadian Civil Service, because I personally complied with the laws of Alberta and faithfully adhered to an Agreement filed with Court, it is proper that "Gordon Knight be imprisoned [for] five years."

302. In a recent letter dated Oct 20, 2020, Government Counsel reiterated their intention to punish me personally for complying with the text of the Agreement and Provincial law rather than Canadian Civil Service fantasies about what they would have preferred both said.

303. Quoting the letter; "We have instructions to prosecute a contempt hearing through to penalty stage and conclusion."


**SUMMARY**

304. We submit that, in the circumstances of this case, it is appropriate to dismiss the CSA claim for the following reasons:

THE COURT LACKS JURISDICTION

305. The proper jurisdiction for matters of Canadian copyright is Canada.

306. The Berne Convention is inapplicable because the subject publication, Knight's Code, is not sold into the United States.

307.   In this, the CSA claim has no legal basis in the United States; their legal recourse is rightfully in Canada.

THE VENUE IS NOT PROPER

308.   The Plaintiff is an Agency of the Federal Government of Canada.

309.   The Government of Canada has within its natural purview all of the authorities needed to rectify genuine instances of copyright violation within its borders.

310.   As the subject publication, Knight's Code, is a reproduction specifically authorized by the Government of Alberta Queen's Printer, and is further authorized through PS Knight's possession of a valid copyright assignment for text of that law, duly and lawfully registered in the United States, and as PS Knight possesses an authorization by CSA itself to reproduce the subject text of CSA's litigation, and as all of these are availed within the jurisdiction of Canada, the Country of Canada and its Court system and its regulatory enforcement framework is the proper venue for this dispute.

PLAINTIFF FAILS TO STATE A CLAIM WHICH THE LAW WILL RECOGNIZE AS ENFORCEABLE

311.   The PS Knight Americas Inc copyright was accurately and validly registered in the US.

312.   PS Knight Americas Inc is conducting itself legitimately whether legislation is considered private property or public property; if private property by PS Knight's own copyright assignment, CSA's authorization of PS Knight, or by PS Knight's US copyright registration or, if public, by Alberta Queen's Printer Copyright in Canada and the 2020 US Supreme Court Ruling.

313. The Berne Convention is inapplicable for reasons noted above and cannot plausibly be stretched into enforcement in this case without substantively impairing the original purpose and future applicability of Berne.

314. The basis for CSA claims of copyright on Canadian electrical law is the Ruling known as Manson's Law, which only applies in Canada, which does not apply to Civil Service operations such as CSA, and the principles of Manson's Law have already emphatically and recently been struck down by the Supreme Court of the United States.

315. Finally, consider the matter in candour.  Nine years of Canadian Civil Service and Judicial corruption have brought us to this point.

316. Consider; What did we do that we should be subjected to such litigation abuses?  Did we not obey the relevant Queen's Printer Copyright law?  Did we not have a License covering the period prior to Queen's Printer applicability?  Then on what basis does the Canadian Civil Service wage their war?  It's just force, isn't it?  The law is nothing; might makes right.

317. In this legal saga, Canadian Courts have Ruled that laws have no meaning if the Civil Service is inconvenienced by them, and no enforceability if the Civil Service would be encumbered by them.  In the course of these cases, and in order to protect the interests of their fellow Civil Servants, Canadian Courts have Ruled that laws are privately owned, that laws mean the opposite of what they say they mean, that bribing of public and elected officials is legal, that contract law cannot be relied upon, that truth is no defence, that perjury is prosecuted against citizens while wholly acceptable for Civil Servants, that Judges can violate laws with impunity, Trials can be rigged without difficulty, Judges can be legally lobbied by Civil Servants for a desirable verdict, that Judicial Conduct Principles are meaningless window dressing, that citizens can be preyed upon and indeed financially devastated for the impertinence of obeying the law, while

Civil Servants can be rewarded with the sum of the lifetime's labour of their victims by Canadian Courts just handing them what they ask for.

318. There is no recourse to injustice in Canada. There are no laws in Canada. There is only force.

319. This is the reality we have been dealing with in Canada, are now lamentably dealing with in this Country, and what we have responded to in this Motion to Dismiss.

320. On these bases, we request that this honourable Court provide relief by dismissing the claim in its entirety.

December 14, 2020

Gordon Knight

for:

PS Knight Americas Inc

*Interim Address at;*
6055 Red Day Road
Martinsville IN 46151
T.403.648.2908
F.403-648-2909